My office is next to a fire department, so if we hear any sirens, I just wanted to apologize for that. It's a bit out of my control. It won't be your cell phone. No, sir. No, Judge. May it please the court, my name is Gregory St. Mr. Goodwin's sole point on appeal here is the sufficiency of the evidence argument. Just briefly about the case, Mr. Goodwin was charged in count seven with conspiracy to commit offenses against the United States. Specifically, there were three separate offenses. Committing healthcare fraud and submitting false claims. You're fading in and out. I'm not sure what the... Can you hear me okay now, Your Honor? Yes. It may just have been when you were looking down, but... Yeah, I'm looking at some of my notes. Hopefully that didn't take too much away there. There were 11 other counts of individual healthcare fraud. As this court has held before, sufficiency of the evidence arguments are basically fact intensive. What I thought I would do is just provide a couple facts that I believe the court should consider when it comes to whether Mr. Goodwin had the intent to defraud or whether Mr. Goodwin acted knowingly and willfully. The government's main witness in this matter was Anthony Camillo. He ran a laboratory in St. Louis. He would accept laboratory samples from doctor's offices and other healthcare providers around the Midwest. The reason I bring up the first fact of Mr. Camillo was that he had ran a lab prior to meeting Mr. Goodwin. His lab was raided by law enforcement. During that raid, law enforcement asked for if he had any contracts that he had with some of his marketers. Mr. Camillo provided one of those contracts. The agent right away told him, well, that's a kickback. When Mr. Camillo testified, he said this was a red flag moment, but he disagreed with the agent. He continued on operating his laboratory with those same kickback contracts two years prior to ever meeting Mr. Goodwin. Another fact about Mr. Camillo was that he contracted with another lab to handle some specimens that his own lab could not test. One of those labs was the Western Slope Laboratory. The owner of the Western Slope Laboratory was actually on the Medicare exclusion list. He could not handle or test samples that were going to be sent for reimbursement through Medicare. Mr. Camillo knew this despite testifying otherwise in our trial. Mr. Camillo instructed one of his associates, Robert Sommerfeld, to lie to Mr. McCormick, the head of Western Slope, and actually say, no, the samples we're giving you are not Medicare samples. You can test them. You can run them through your lab. They won't be in violation of the fact that you're on the exclusion list. A third fact would be that when Mr. Camillo contracted with Mr. Goodwin's company, Southwest Disability Services, this was two years after he had that conversation with the agent where this red flag went up, and Mr. Camillo failed to disclose to Mr. Goodwin or his co-defendant, Phillip Jones, that this contract would require and would account equal to kickbacks. He never told him that. Mr. Camillo was basically talking to Mr. Goodwin and Mr. Jones, two people who the government states in their briefs that are very experienced in Medicare, but Mr. Goodwin had no experience in these laboratory samples or anything like that. He was essentially following the direction of Anthony Camillo, who I described as a con man. It was someone who I don't believe knew the truth while he was testifying, didn't know the truth while he was operating his business. It was purely a complete greed scam that he was running, and he would take individuals like Reuben Goodwin, who didn't have experience in that particular specific field, would take advantage of them. Finally, the last fact, Judge, is Mr. Camillo hired his own family, his two children and his wife, and he never told them that this was illegal. In fact, they didn't get charged in this case, but they did participate in a diversion program where they were held to pay back restitution. My point there would be if this Mr. Camillo, Anthony Camillo, would do this to his own family, imagine what he told Mr. Goodwin. Your client did participate in the negotiation for these agreements, right? He did not. Actually, that was an associate of his, Philip Jones, who signed the contract, but Mr. Goodwin was not involved directly with Mr. Camillo in those early stages of the contract. Well, okay. So what is the evidence with respect to the conversation you had with an employee about the requirements of the Medicare law? Are you asking, was he given any instruction from Mr. Camillo about what Medicare requires? I believe there was a lab employee that talked to him about it, wasn't there? I'm not sure. There was a conversation between him and someone else about the propriety of certain kinds of arrangements or at least about the general character of the Medicare for all provisions. Is that not correct? My understanding is that when he signed that Medicare application, it was assumed that he would be made aware of those provisions and would- Wasn't it SWDS? I'm not sure what that stands for. That is the Southwest Disability Services. That's the company- He was a director for 13 years. Yes, sir. And that was a Medicare provider which required Goodwin to sign a form affirming that he would not violate the kickback statute. That's right. And when was that in relation to the contract that Jones presented to him and that he then wanted to take a- and he took a close look at? It was prior to signing that contract, Judge. It was prior to entering the contract. I don't have the exact- What can a reasonable jury infer from that? Well, a reasonable jury could infer that perhaps he- When people sign these applications, I don't know that they actually read the whole thing, Judge. I think- and we brought this up in the trial, that there are times when you accept- For instance, online, there's the button to click. I accept and understand the terms of this agreement. And I don't believe Mr. Goodwin actually- Not only did he not read the whole agreement, but I don't believe he understood the contents of the anti-kickback statute. Mr. Smith, but do we even need to rely on that? It's my understanding that Mr. Goodwin actually received reports showing the payments for the specimens. He did, Your Honor. And I concede that that was on an email. And I believe he also asked for further reports to be sent to him. My argument for those would be that he was trying to operate the business appropriately and wanted to know everything that was going on. And there were certain things that he just was not being told. And I'll just- to finish, Your Honor, here, there has to be some intent to defraud. And given the deceit that- and I explained this in my brief, but given the amount of deceit that Anthony Camillo was responsible for, I just don't see how Mr. Goodwin could have had that requisite intent or acted willfully to defraud. And with that, if there are no other questions, I will- I will reserve my time. Very good. Thank you. Ms. Carroll, for the government. May it please the court, Your Honors. The evidence of trial established that Ruben Goodwin was the executive director of a residential care facility for developmentally and mentally disabled individuals. And during his term as executive director of that facility, he caused those individuals to be subjected to repeated medical tests without the knowledge or consultation of a physician. And for each specimen that he caused to be taken from those patients in his care, he received an illegal kickback payment. There is no contention by the appellant that Mr. Goodwin did not receive illegal kickback payments. I'm sorry, did not what? I'm sorry, I couldn't hear you. Receive illegal kickback payments. Are you able to hear me, Your Honor? Just barely, thank you. The appellant does not contend that the evidence didn't establish that he did not receive illegal kickback payments. The evidence was uncontroverted that the defendant did, in fact, receive illegal kickbacks. The evidence was also uncontroverted that the defendant's conduct did result in Medicare being defrauded. The appellant's only contention is that the defendant, Ruben Goodwin, somehow could not have known or did not know that it was wrongful to receive illegal kickback payments by testing... What you said about the doctor, the doctor not knowing the doctor or being no actual doctor, what was the relevance of that particular fraudulent conduct, if it is, and what's charged here? Well, Your Honor, there was a three-object conspiracy charged in Count 7. One of those objects was the kickback statute, but the other two objects were the False Claims Act and healthcare fraud. Okay, there's no relevance to the substantive counts. Is that right? The 11 substantive counts, Your Honor, were all healthcare fraud counts, and the evidence at trial was that Medicare would not pay for a test a doctor did not pay for. That was a separate, distinct basis from this particular part of the conspiracy that you're talking about with respect to the doctors. You're right. There are multiple reasons that these claims should never have been paid for. One of those reasons was the existence of the kickback arrangement. The other reason was that a doctor did not order those tests. And that was part of the substantive counts as well? Yes, Your Honor, that's right. Okay, thank you. The court actually instructed the jury that one of the bases for concluding that the object regarding the False Claims Act was satisfied was that a physician had not ordered the tests. Well, that's a conspiracy, isn't it? That is, that is the conspiracy. I'm talking about the substantive counts of fraud. The doctor, as I said, had nothing to do with those? You're right, Your Honor. Okay, thank you. Thank you. The evidence at trial established that on its face, this arrangement was wrongful. The court is aware of the Third Circuit case saying that it cannot be a matter of of ambiguity, that it's not appropriate to receive a payment in connection with a medical referral, and the anti-kickback statute is not highly technical. But here, we're not talking about someone who was a layperson, someone who would not have understood the wrongfulness of the conduct. We're talking about someone who was an executive director of a Medicare and Medicaid-enrolled company for years, in fact, for a decade, before he ever met Anthony Camillo. The defendant's involvement in Medicare and Medicaid resulted in the facility he ran getting millions of dollars in health care reimbursements. And I know that the court asked whether Mr. Goodwin was involved in negotiation of the kickback contract. The answer is that he was actually involved. The evidence at trial was an email exchange between Mr. Goodwin and Mr. Jones, and it was just five days before the dated execution of the contract. In that email exchange, Mr. Goodwin asks Mr. Jones to forward him the latest draft of the kickback agreement because he says, we, meaning Goodwin and Jones, have rejected an earlier draft. So Mr. Goodwin was, in fact, involved at the inception of the terms of the kickback contract, and he did know that he was receiving a per-specimen kickback payment. In addition to Mr. Goodwin's experience as a health care provider, he was also explicitly consulted with by Diana Emnett, the medical biller. The evidence at trial was that Ms. Emnett sat down with Mr. Goodwin and explained to him that an ordering physician, a doctor, who had ordered the test had to be identified on the testing forms and that that doctor needed to give the diagnosis code. Subsequent to a medical biller explicitly telling Mr. Goodwin how claims should properly be reimbursed, Mr. Goodwin received an email that was forwarded to him by Mr. Jones. In that email, Mr. Camillo advised Mr. Jones that you could not simply make up diagnosis codes because Diana Emnett, the medical biller, was very by-the-book, and it was a big no-no for her to have someone make up diagnosis codes. Mr. Camillo went on to say, if you are asked, you need to tell Diana Emnett that you did call the facility, that you did call a doctor and get the diagnosis codes. Mr. Goodwin saw that email in which he was told, if someone who follows the rules asks you, you should misrepresent what you are doing. The evidence at trial was that no doctor had ever seen these patients and no doctor had ever ordered the tests. Both Dr. Thomas, who was on the billing reports Mr. Goodwin received, and Dr. Kim testified that they had never met with Reuben Goodwin and Phillip Jones. They had never discussed the fact that testing specimens were going to be sent to an out-of-state lab and that Mr. Goodwin was going to receive a cut of the health insurance reimbursements. Those doctors did not order those tests. And Dr. Thomas testified he had never even been to the facility where the patients were located. And Dr. Kim testified that he had never used AMS Medical Laboratory. And Mr. Goodwin received explicit reports listing the names of those physicians who had never treated the patients. And he also received reports that broke down, dollar by dollar, every kickback he was getting from Mr. Camillo. What's the evidence on whether he knew that this arrangement was illegal, the kickback arrangement? Of course, one can generally know the kickbacks are illegal because the very name of them gives you that hint. But what's the evidence here that he knew it was illegal to do this? The court asked Mr. Smith about the Medicare enrollment application that explicitly advises the participants of the anti-kickback statute and the need to comply with it. And that Medicare enrollment application was actually executed in the midst of the conspiracy. Sorry? It was executed in the midst of the conspiracy. It was executed on February 25, 2015. Can a jury infer from that fact, beyond a reasonable doubt, that he was guilty because he must have read what it was he signed? Your Honor, the jury could and did clearly infer that Mr. Goodwin was aware of the wrongfulness of his conduct because it's not, in fact, the same thing as signing, for example, a credit card contract where you don't really read all the fine print. Mr. Goodwin's whole business model was premised on understanding Medicare reimbursements. That is how he made his money. It is not the case. Okay, so really, this business of being informed really doesn't add much to your case. I mean, it seems to me you're – I don't mean to put words in your mouth, and so you'll tell me if I'm doing that, but you seem to be resting – the record seems to be best in your favor with respect to the fact that he had a lot of experience with these kinds of arrangements and therefore would necessarily have known that they were illegal. Is that really the – is that what your case turns on? I believe that it also is important that he signed a document, which is not, in fact, that lengthy or dense, explicitly acknowledging his understanding of the law while he was violating. And the fact that it is a document that contains a number of provisions is not a basis for concluding that he couldn't have understood it. There was no evidence that Mr. Goodwin did not understand the document or that he was overwhelmed by the document. I know that Mr. Smith has mentioned that he does not believe his client fully understood it, but there was no evidence to that effect. What exactly is he acknowledging? That someone told him that there's some law involved here, or what? I mean, what exactly is the acknowledgement that is involved here? He acknowledges his comprehension of the anti-kickback statute as well as his willingness to comply with it. Okay. Thank you. He also acknowledges in that application that he understands that he cannot submit false information to Medicare, which he did repeatedly in the form of listing fictional diagnoses. If I sign a document that says I fully understand the Secretary of Labor's regulations implementing the Fair Labor Standards Act, when in fact I'm successfully accused of not understanding one of them, I could commit a 1001 crime. You arguably could have, Your Honor. Well, don't bring that one to me. Good news. This isn't that situation. Well, it's your argument, and I frankly am more than skeptical of the argument. My argument, Your Honor, is that when someone whose entire business model is premised on understanding Medicare regulations and who makes all of his money by understanding those regulations and attests that he understands them and will comply with them, the evidence is that he violated that understanding, and that is sufficient for the jury to have inferred that he had the necessary intent. That's sufficient for a jury to infer. Who's been convicted of this kind of fraud just on the basis of he signed an acknowledgment, he understood the law, and then he broke it? Well, Your Honor, the law is that experience alone is enough, and the government's briefs— Okay, what Supreme Court case are you just referring to? Sorry, Your Honor, one moment. Let me find it for you. So it's United States v. Kosh, Your Honor. It's 674 F Appendix 592. So it's not controlling law, even if it's our unpublished opinion. And that case, Your Honor, cites to a published opinion, which is Richard 471 F2D 105, and that case held that the background and experience of the appellant was sufficient evidence of the appellant's ability to form his requisite willful intent. And that, what court? That is the Eighth Circuit, Your Honor. Before the Supreme Court is— Supreme Court's gotten a lot more interested in mens rea issues since then, right? Yes. That's a 1973 case. 1973, Your Honor. Yeah, and that's probably before McNally and a whole bunch of other stuff. I will say, Your Honor, this court, the Eighth Circuit, cited that case in a 2017 opinion. If the court has no further questions, I will ask that the judgment and sentence be affirmed. Very good. Thank you. Thank you. Mr. Smith for approval. Your Honor, at this time, I'm just going to rest on my argument and ask that the matter be reversed and a new trial be ordered. Very good. Thank you, counsel. You've made a factually complex case, more understandable, and taught us where in the record we may need to look further, and we will take it under advisement. You've helped us handle this new technology very well, and we appreciate that. Thank you, Your Honor.